Madden, Judge,
delivered the opinion of the court:
These cases present the same questions which the court considered and answered in the cases of Edward P. Stahel & Co., Inc., et al. v. United States, 111 C. Cls. 682, certiorari denied 336 U. S. 951. We have reconsidered the questions and have come to the same conclusions. No purpose would be served by reciting again the historical facts recited in our former opinion, and again in our findings in the instant cases.
The plaintiffs in No. 47764 are not entitled to recover, since they have failed to prove ownership of the claim. The plaintiffs in No. 47765 are not entitled to recover. The petitions in Nos. 47764 and 47765 will be dismissed. The plaintiffs in the other cases are entitled to recover the amounts shown in the conclusion of law.
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
*47 FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Bichard H. Akers, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) Alpha Silk Company, the plaintiff in No. 47755, is a corporation duly incorporated in the State of New York.
(b) Bear Brand Hosiery Co., the plaintiff in No. 47756, is a corporation duly incorporated in the State of Illinois.
(c) Cohn-Hall-Marx Co., the plaintiff in No. 47757, is a corporation duly incorporated in the State of New York.
(d) Davenport Hosiery Mills, Inc., the plaintiff in No. 47758, is a corporation duly incorporated in the State of Delaware.
(e) George Elbogen & Co., the plaintiff in No. 47759, is a corporation duly incorporated in the'State of New York.
(f) Morton Feldman, the plaintiff in No. 47760, is the assignee for the benefit of all the stockholders of Morton Feldman, Inc., a New Jersey corporation which was dissolved in June 1943.
(g) E. Gerli & Co., Inc., the plaintiff in No. 47761, was a New York corporation which was dissolved on October 13, 1942, in accordance with Section 105 of the New York Stock Corporation Law. The present claim has been distributéd to the stockholders in kind, and they have authorized the corporation and its liquidating trustees to liquidate it for them. Prior to its liquidation, the corporation had been an importer of and dealer in raw silk.
(h) Holeproof Hosiery Co., the plaintiff in No. 47762, is a corporation duly incorporated in the State of Wisconsin.
(i) Kahn & Feldman, Inc., the plaintiff in No. 47763, is a corporation duly incorporated in the State of New York. In 1941 it was engaged in purchasing and throwing raw silk.
(j) M. K. M. Hosiery Mills, Inc., and Tennessee Knitting Mills, Inc., the plaintiffs in No. 47764, are corporations duly incorporated in the Commonwealth of Massachusetts. The plaintiffs allege that they are successors in interest, following voluntary statutory dissolution, to Massachusetts Emit *48 ting Mills, a corporation incorporated in tbe State of Massachusetts, but there is insufficient evidence in the record to support such allegation.
(k) Max Oltarsh, Moe Oltarsh, Abraham Oltarsh, and Martin Oltarsh, the plaintiffs in No. 47765, are partners doing business as J. Oltarsh according to the laws of the State of New York.
(l) Dorgin Textile Corporation (formerly Pacific Industrial Corporation), the plaintiff in No. 47766, is a corporation duly incorporated under the laws of the State of New York, certificate of change of corporate name having been filed with the Secretary of State of New York on April 8, 1947. In 1941 it was a dealer in raw and thrown silk and a manufacturer of thrown silk.
(m) Phoenix Hosiery Company, the plaintiff in No. 47767, is a corporation duly incorporated in the State of Wisconsin.
(n) Rudolph-Desco Company, Inc., (formerly Charles Rudolph Corporation of New York), the plaintiff in No. 47768, is a corporation duly incorporated in the State of New York. On May 1,1948, its name was changed from Charles Rudolph Corporation of New York to Nick Rappold Corporation. On January 2,1951, its name was changed from Nick Rappold Corporation to New York Deseo Corporation. On November 1,1952, its name was changed from New York Deseo Corporation to Rudolph-Desco Company, Inc., its present name.
(o) Fritz de Schulthess and Monica de Schulthess, the plaintiffs in No. 47769, are copartners doing business in accordance with the laws of Switzerland under the name of de Schulthess & Company, formerly Charles Rudolph & Co., of Zurich, Switzerland.
(p) Sauquoit Silk Company, Inc., the plaintiff in No. 47770, is a corporation duly incorporated in the Commonwealth of Pennsylvania.
(q) Siber Hegner & Company, Inc., the plaintiff in No. 47771, is a corporation duly incorporated in the State of New York.
(r) Standard Hosiery Mills, Inc., the plaintiff in No. 47772, is a corporation duly incorporated in the State of North Carolina.
*49 (s) Belding Heminway Company, the plaintiff in No. 47782, is a corporation duly incorporated in the State of Connecticut.
(t) Gudebrod Bros. Silk Co., Inc., the plaintiff in No. 47788, is a corporation duly incorporated in the Commonwealth of Pennsylvania.
(u) Miller-Smith Hosiery Company, the plaintiff in No. 47784, is a corporation duly incorporated in the State of Tennessee.
(v) Lawrence Schiff and Sidney L. Schiff, the plaintiffs in No. 47785, are partners doing business as Lawrence Schiff Silk Mills according to the laws of the State of New York.
(w) John Hand & Sons, Inc., the plaintiff in No. 47786, is a corporation duly incorporated in the State of New Jersey.
2. Kaw silk is not, and never has been, produced in commercial quantities in the United States. All such silk has been imported. For the past fifteen or twenty years about 85 percent of the raw silk used in the United States has been produced in Japan, the balance coming principally from China and Italy, with small amounts originating in Brazil, Persia and other parts of the Near East.
3. When the thread, fiber, or strand of raw silk is unwound from the cocoon of the silkworm, it is first wound into skeins. Skeins in turn are combined or put into large bundles or books, and a number of such bundles are combined into a bale. A standard bale of raw silk weighs between 130 and 135 pounds. A bale is the normal raw silk unit of commerce. Each bale is given and thereafter bears a distinguishing number.
Bales of raw silk are tested by a process of sampling. “Denier” is a term used to denote the count or size of silk threads. “13An denier” originally meant that sample skeins each containing a fiber of silk 450 meters long taken from a given bale averaged in weight between 13 and 15 deniers, that is, between 65 and 75 centigrams. In recent years this meaning has been narrowed and the accepted trade meaning of the term t!l%5 denier” now is that the average weight of the samples is between 13% and 14% deniers.
*50 Testing raw silk for grade involves the determination of various characteristics such as evenness, elasticity, cleanliness, etc. The combined and weighted result of these tests is then compared with a theoretical perfection of 100 percent. For example, “D~78” means 78 percent perfect. “D” means the same as 78 percent, and the letter and figure are used interchangeably and frequently in combination. Likewise, “E” is 73 percent; “C” is 81 percent; “B” is 83 percent; “A” is 85 percent; “AA” is 87 percent; “AAA” is 90 percent perfect according to this process of grading; and “Special AAA” may be various percentages above 90 percent. The standard or base commercial grade on which prices are generally quoted is [1]%6 denier, “D” or 78 percent, and higher or lower grades are paid for at prices a few cents above or below the standard grade price. All prices hereinafter set forth are for the standard grade of silk as above described unless otherwise indicated.
“Conditioned -weight plus 2%” relates to the moisture content of raw silk and is the commercial standard in respect to moisture in buying and selling silk. Whenever in these findings reference is made to the weight of raw silk, the figure given is conditioned weight plus 2 percent.
4. The New York Commodity Exchange (hereinafter referred to as “Commodity Exchange”) was formed in 1933 by merger of the then established silk, hide, rubber and metal exchange, and is located in New York City. In 1941 and for many years prior thereto, New York City was the pi'incipal and dominant market in the United States for raw silk. The Commodity Exchange was the only market in the United States on which “futures” contracts in raw silk were traded. In addition, most of the importers of raw silk had offices in New York City, and they sold silk in what was colloquially called the “uptown” or “spot” market, usually by direct sales rather than on the Commodity Exchange, these sales being generally arranged by brokers or to dealers. The greater part of the silk purchased for consumption in this country was purchased in this spot market. Future prices, as quoted on the Commodity Exchange, were usually lower than spot market prices for cor *51 responding grades. The two prices tended to move in the same direction in a parallel fashion.
5. The average monthly silk prices for Japan white silk, 13/i5 denier, grade D (78 percent) for the period from July 1900 through June 1941, were as follows:

For the period from January 1, 1939, through June 30, 1941, the high and low prices for raw silk for each month on the Commodity Exchange for delivery within the current month were as follows:

*52

The daily closing prices on the Commodity Exchange for raw silk for delivery within the current month from July 1 through July 25,1941, were as follows:

The last actual sale on July 25, 1941, on the spot market, shown by the evidence, was at $3.57 per pound.
6. During the year 1941, Rule 5 of the By-Laws and Rules of the Commodity Exchange as promulgated by the Board of Governors thereof provided as follows:
Trades for future delivery of silk in any month shall not be made during any one day at prices varying more than twenty-five cents per pound above or below the lowest price of the closing range of such month as established by the Committee on Quotations as the close of the preceding business session of the Exchange.
The daily fluctuations in prices of raw silk from July 21, through July 25, 1941, were within the range provided by these rules and regulations and did not call for action by the Board of Governors under Rule 5 set out above. This provision did not limit prices upon transactions in silk for delivery during the current month, which are the prices quoted in finding 5, for the period from January 1, 1939, *53 to July 25,1941. During the week of July 21,1941, futures prices of raw silk on the Commodity Exchange reached such 25-cent limit only on July 25, 1941. Trading on the Commodity Exchange was suspended on July 26, 1941, through the governmental action hereinafter described.
7. A substantial amount of trading in silk, both on the spot and futures markets, took place during the period July 21 to July 25, 1941, within the range of prices indicated above for that period. It was estimated by OP ACS and a leader of the silk industry that of the silk in this country at the time, approximately 15 to 20 percent was traded in during that period at the prices then prevailing. During the period from September 1939 to February 1940, following the outbreak of war in Europe, two instances occurred where fluctuations in prices were similar to that which occurred during the period July 21 to July 25,1941.
8. Two of the plaintiffs, E. Gerli & Co., Inc., who was an important dealer in and importer of raw silk, and Kahn & Feldman, Inc., who was both an importer of raw silk and one of the largest thrown silk dealers, actively carried on their business operations during the period of July 21 to July 25, 1941. During that period, E. Gerli & Co. entered into contracts for the sale of 867 bales of raw silk and for the purchase of over 2,000 bales at the prevailing market prices. During the same period, Kahn & Feldman, Inc., entered into contracts covering the sale of substantial quantities of thrown silk to its regular customers for the purchasers’ business requirements. The price quotations of Kahn & Feldman, Inc., for standard five thread five turns thrown silk were $3.67 on July 21,1941, $3.72 on July 22,1941, $3.87 on July 23 and 24,1941, and $4.27 on July 25, 1941. These prices of thrown silk were based on the prices of raw silk prevailing on those days plus the price of throwing which was approximately 60 cents per pound for standard grade silk during that period. All thrown silk that was purchased from Kahn & Feldman, Inc., during the week of July 25, 1941, was paid for at the contract prices and deliveries were made during the period between July 26 and October 16,1941.
The transactions of both E. Gerli & Co., Inc., and Kahn & Feldman, Inc., referred to above in this finding, were trans *54 actions entered into by these concerns in the ordinary course of business. At the time these transactions were entered into neither concern was aware of any decision by the Government to terminate the importation of silk, though both were aware of the unsettled conditions in the world and the strained relations between the United States and J apan referred to in finding 10.
9. During the period from the beginning of the war in Europe on August 31, 1939, to July 25, 1941, there was a gradual increase in the prices of commodities generally. While the increase in the price of silk was more than that of some commodities, it was less than that of many important commodities, including cotton, wheat, wool, corn and hogs, and was approximately the same as rubber and hides. The situation in the commodity markets, including silk, during the period just mentioned, was of an inflationary nature. Silk, like other commodities which come to a large extent from foreign sources, is a commodity which tends to have a rapidly fluctuating price level.
After July 25, 1941, the prices of commodities generally continued upward, and, without the controls thereafter imposed as herein described the price of raw silk would also have increased.
Under normal conditions thfere is a close relationship between market prices for raw silk prevailing in Japan and those which prevail in the United States, the difference representing approximately the cost of physically transporting the silk from J apan to this country of from 10 to 15 cents per pound, that is, the price in this country is from 10 to 15 cents higher than in Japan. However, subsequent to about July 1, 1941, this relationship no longer prevailed, the prices in Japan falling as the prices increased in this country until on July 25,1941, the spread was approximately 91 cents.
10. On Saturday, July 26, 1941, the President of the United States issued Executive Order No. 8832 amending Executive Order No. 8389 of April 10,1940, as amended, and thereby made illegal all financial payments or transfers of money, credit, or property to or for the account of Japan or any national thereof, except as permitted by license as *55 provided therein. That order had the effect of “freezing” all Japanese assets in the United States, and of terminating most commercial transactions with Japanese nationals, including all commercial transactions in raw silk. The President had stated, at a press conference on the afternoon of Friday, July 25, at Hyde Park, New York, that he intended to take this action the following day. This was the first official information to the public that such action was to be taken.
While the public did not know that such action was to be taken by the President, it was generally aware of the unsettled conditions which existed in the world at that time and of the strained and unsatisfactory relations which had existed for some time between the United States and Japan. During the period when such relations had existed, some threats of a similar nature by the United States against Japan had not materialized and at least some of the traders in silk were of the opinion that official action would not be taken against Japan at this time, and dealt on the Exchange on the assumption that relations permitting trading in silk would continue. However, a very important factor which gave rise to the increase in the price of silk during the period from July 21 to July 25,1941, was the fear that there might be a break in the supply of silk. Other contributing factors to the increase in price were the increased consumption at that time of raw silk by the Japanese, the stabilization schemes which were being employed by the Japanese Government to support the price of raw silk, and the seasonal demand for raw silk during June, July, and August by manufacturers of silk products for the Christmas trade.
Importations of raw silk from Japan ceased within a few days after July 26, 1941, and were not resumed until after the year 1945. Importations of raw silk from Shanghai (which was at that time a principal market for silk in China and which was then controlled by the Japanese) and from other countries of origin also ceased shortly thereafter and had not been resumed in commercial quantities prior to the surrender of Japan.
11. On July 26, 1941, purportedly acting pursuant to the authority conferred upon the President by the Act of June *56 28, 1940 (54 Stat. 676), as amended by tbe Act of May 31, 1941 (55 Stat. 236), and delegated by tbe President to the Office of Production Management (referred to hereinafter as “OPM”), the OPM issued General Preference Order M-22. That order read as follows:
Whereas, the uncertainty of future shipments of Raw Silk from abroad and national defense requirements for Silk have created a shortage thereof and it is necessary, in the public interest and to promote the defense of the United States, to conserve the supply and direct the distribution of Silk;
Now, Therefore, It Is Hereby Orbered That:
§963.1 GeNeral PrefereNce Order M-22. (a) Definitions. — For the purposes of this Order:
“Person5) means and includes any individual, partnership, association, corporation or other form of enterprise.
(b) Restrictions on deliveries. — No Person shall hereafter make delivery, and no Person shall accept delivery, of Raw Silk unless specifically authorized by the Director of Priorities, provided, however, that deliveries of imported Raw Silk may be made without restriction to any Person importing the same, either directly or through an agent.
(c) Restrictions on frocessing. — No Person shall during the week commencing Monday, July 28,1941, or during any succeeding week, knit, weave or otherwise process thrown Silk in excess of that knit, woven or otherwise processed by him during the week ending July 26, 1941, unless specifically authorized by the Director of Priorities.
(d) Appeal. — Any Person who considers that compliance with this Order will work an undue hardship upon him may appeal by telegraph or mail to the Director of Priorities, Office of Production Management, Washington, D. C., setting forth the pertinent facts and the reason such person believes that he is entitled to relief.
Issued July 26,1941, effective immediately.
12. On the same day that OPM issued the order set out in the preceding finding, July 26, 1941, Leon Henderson, Administrator of the Office of Price Administration and Civilian Supply (hereinafter sometimes referred to as “OPACS”) sent the following telegram to the Commodity *57 Exchange which was the only market in New York for the purchase and sale of futures contracts in raw silk:
Because of uncertainty in Far Eastern situation and decision of this office to set maximum prices for silk, believe it very important in public interest that trading in silk on Commodity Exchange be suspended until situation clarifies.
Thereupon the Commodity Exchange suspended such trading and remained closed through 1945. The last day on which it was open as a market for the buying and selling of raw silk until after the termination of the War was Friday, July 25, 1941. Thereafter and continuing until after the termination of the War, raw silk was purchased and sold only in accordance with and for the uses prescribed by the government regulations herein described.
Likewise on the same day, July 26, 1941, Mr. Henderson announced that OP ACS would, within a few days, impose a price ceiling on raw silk at approximately the level that had prevailed in the markets on Monday, July 21, 1941. This announcement was made without prior consultation or discussion of prices with representatives of the silk industry, or any of the plaintiffs herein. A joint committee of OP ACS and OPM officials existed at that time for the purpose of coordinating policies with respect to various commodities including silk, but the evidence does not satisfactorily show what discussion, if any, took place between those agencies on or prior to July 26,1941, with respect to the acquisition of silk.
13. On August 2, 1941, the OPM amended General Preference Order M-22 by adding to paragraph (c) a new sub-paragraph reading as follows:
(2) No person shall after twelve o’clock midnight on Saturday, August 2,1941, throw, spin, or otherwise process raw Silk, unless specifically authorized by the Director of Priorities.
14. On the same day, August 2,1941, OP ACS, acting under the authority conferred upon it by Executive Order No. 8734 of April 11,1941, issued an order known as Price Schedule No. 14. That price schedule, which established maximum prices for raw silk, read as follows:
*58 During the week of July 21, 1941, the price of raw silk rose sharply. This advance was due to fear on the part of traders that, as a result of the changed situation in the Far East, the supply of raw silk coming to this country from the Orient would be cut off, or at least seriously curtailed. Because of the probability that the supply of raw silk will be limited to that presently on hand, a large part of which may be required for defense needs, the danger is grave that the price of raw silk and silk waste, unless subjected to control, will continue to rise.
Accordingly, pursuant to and under the authority vested in me by Executive Order No. 8734, it is hereby directed that:
§ 1338.1 Maximum prices for raw silk and silk waste. — On and after August 4, 1941, regardless of the terms of any contract of sale or purchase, or other commitment, except as may be provided in a supplement or supplements to this Schedule, no person shall sell, offer to sell, deliver or transfer at a price, raw silk or silk waste to any person, and no person shall buy, offer to buy or accept delivery of, raw silk or silk waste from any person at prices higher than the maximum prices set forth in Appendix A, incorporated herein as § 1338.8.
Lower prices than those set forth in § 1338.8, Appendix A, however, may be charged, demanded, paid or offered.
§ 1338.2 Records. — Every person who sells or delivers, or purchases or accepts delivery of, raw silk or silk wastej shall keep for inspection by the Office of Price Administration and Civilian Supply and preserve for a period of not less than one year, complete and accurate records of every sale, delivery, purchase, or acceptance of delivery of raw silk made, which records shall show the dates thereof, the name and address of the person from whom or to whom each such purchase, sale or delivery was made, the price paid or received, and the quantity of each kind or grade so sold, delivered, purchased, or accepted for delivery.
§ 1338.3 Affirmations of compliance. — On or before September 10, 1941, and on or before the 10th day of each month thereafter, every person who, during the preceding calendar month, has sold, or delivered, or purchased, or accepted delivery of raw silk or silk waste, shall submit to the Office of Price Administration and Civilian Supply an affirmation of compliance on Form 114:1 (set forth in Appendix B, which is incorporated *59 herein as § 1338.9) containing a sworn statement that during such month all such sales, purchases or deliveries were made at prices in conformity with this Schedule or with any exception or modification thereof. Copies of Form 114:1 can be procured from the Office of Price Administration and Civilian Supply, or, provided that no change is made in the style and content of the form and that it be reproduced on 8 x 10y2" paper, they may be prepared by persons required to submit affirmations hereunder.
§ 1338.4 Enforcement. — In the event of refusal or failure to abide by the price limitations, report requirements, and other provisions contained in this Schedule, or in the event of any evasion or attempt to evade the price limitations or other provisions contained in this Schedule, the Office of Price Administration and Civilian Supply will make every effort to insure (i) that the Congress and the public are fully informed of any failure to abide by the provisions of this Schedule, and (ii) that the powers of the Government are fully exerted in order to protect the public interest and the interests of those persons who conform with this Schedule in the observance of the maximum prices herein set forth. Persons who have evidence of the demand or receipt of prices above the limitations set forth, or any evasion of or effort to evade such prices, or of speculation, or of the hoarding or accumulation of unnecessary inventories of raw silk or silk waste, are urged to communicate with the Office of Price Administration and Civilian Supply.
§ 1338.5 Supplemental schedule and report requirements. — Supplements further defining the scope of this Schedule and, if necessary, requiring reports to the Government, will be issued from time to time when found appropriate.
§ 1338.6 Modification of the price schedule. — Persons complaining of hardship or inequity in the operation of this Schedule may apply to the Office of Price Administration and Civilian Supply for approval of any modification thereof or exception therefrom.
§ 1338.7 Definitions. — When used in this Schedule, the terms:
(a) “Person” includes an individual, partnership, association, corporation or other business entity;
(b) “Raw silk” means the types, deniers, and grades of raw silk set forth in § 1338.8, Appendix A, of this Schedule;
(c) “Silk waste” means the types of silk waste set forth in § 1338.8, Appendix A, of this Schedule.
*60 § 1338.8 Appendix A. Maximum prices for raw silic and silk waste.

* * * * *
§ 1338.9 Appendix B. Form No. 1114:1.
Oeeice ros Emergency Management
Office oe Price Administration and Civillan Supply
AFFIRMATION OP COMPLIANCE POR BUYERS AND SELLERS OP RAW SILK OR SILK WASTE [1]
For the purpose of making an affirmation of compliance with Price Schedule No. 14 of the Office of Price Administration and Civilian Supply, required by Section 3 thereof, I have examined the records for the month of -, 194_, of-, (Name of buyer)' -, of which concern I am_ (Address) _ During that period the above-named concern has not sold, delivered, purchased, or accepted delivery of raw silk or silk waste at prices in excess of those established by the aforesaid Price Schedule No. 14.[2]
(Signature)
*61 Subscribed and sworn to before me tbis-day of_, 194—
(Notary Public)
My commission expires-
* * * * *
Issued this 2nd day of August 1941.
(S) Leon Henderson,
Leon Hendebson,

Administrator.

The action establishing maximum prices for raw silk was taken by OPACS following a study by that agency of the movement of silk prices. It had been the opinion of that agency prior to that time that so long as normal trade relations prevailed with Japan, it could not establish a ceiling price on domestic sales of raw silk without endangering this country’s supply of silk since Japan, the principal supplier, could have refused to sell at or below the ceiling price. When normal trade relations between this country and Japan were terminated on July 26,1941, OPACS felt that it was free to act with respect to the domestic price of silk since changes in the level of those prices would no longer have any effect upon imports of silk into this country. It was also the opinion of OPACS that the increase in the price of silk which had occurred on the Commodity Exchange between July 21 and July 25, 1941, was speculative in nature based on the theory that a break in commercial relations between this country and Japan would cut off the supply of raw silk to this country. OPACS also took into consideration that during the period from September 1, 1930, to July 21,1941, silk prices had exceeded the price which prevailed on July 21, 1941, only during the period from September 1939 to February 1940 — the period immediately following the outbreak of war in Europe and immediately preceding the effective date of this country’s denunciation of its commercial treaty with Japan. It was further the opinion of the OPACS officials that less than 20 percent of the silk in tbis country at the time Price Schedule No. 14 was issued had been purchased at prices in excess of the base price of $3.08 set out in that schedule.
*62 At no time during the administration of that price schedule was an appeal for relief received under the “hardship clause” based upon the ground that the applicant’s cost had exceeded the ceiling prices established by the price schedule.
15. On August 12, 1941, the OPM further amended General Preference Order M-22 by amending paragraph (b) of the order to read as follows:
(b) Restrictions on deliveries. — No person shall hereafter make delivery, and no person shall accept delivery, of Raw Silk unless specifically authorized by the Director of Priorities, provided, however, that deliveries of imported Eaw Silk may be made without restriction to any person importing the same, either directly or through an agent, and provided further that deliveries of Raw Silk may be made without restriction by or to Defense Supplies Corporation, or pursuant to its instructions.
16. On October 16, 1941, OPM amended General Preference Order M-22 to read as follows:
963.1 Geneeal PeepeeeNCe Oedee. (a) Applicability of Priorities Regulation No. 1 — All of the provisions and definitions of Priorities Regulation No. 1, issued by the Director of Priorities on August 27, 1941, shall be deemed a part of this Order, except insofar as they are inconsistent herewith.
ibl Required and permitted deliveries.
(1) The following orders are hereby assigned a preference rating of A-10, and acceptance thereof is required :
(1) Any contract or order for silk cloth, shroud lines, tape or thread for either life, material, or flare parachutes placed by the War Department, the Navy Department, or the Department of Commerce for such parachutes to be delivered to or for the account of the Army, Navy or Weather Bureau of the United States.
(ii) Any contract or order for silk in any form required by the person placing the same to fulfill his contracts or orders on hand, provided such silk is to be physically incorporated in material to be delivered under contracts or orders included under (i) above.
(iii) Any contract or order for raw silk placed by the Defense Supplies Corporation.
(2) Deliveries of imported raw silk may be made to any person importing the same, either directly or through an agent.
*63 (c) Restrictions on deliveries. — Notwithstanding anything in Priorities Regulation No. 1 to the contrary, no person shall hereafter sell or otherwise transfer title to, or make any deliveries, and no person shall purchase or accept delivery of Raw Silk except as provided in paragraph (b) hereof, unless specifically authorized by the Director of Priorities.
(d) Restrictions on throwing, weaving and other processing.
(1) No person shall, during any week, knit, weave, or otherwise process thrown silk in excess of the amount knit, woven or otherwise processed by him during the week ending July 26,1941, unless specifically authorized by the Director of Priorities.
(2) No person shall throw, spin, or otherwise process Raw Silk, except as otherwise provided herein or unless specifically authorized by the Director of Priorities.
(e) Reports. — Each person delivering or accepting delivery of Raw Silk in accordance with paragraph (b) hereof, or as specifically authorized by the Director of Priorities, shall, on or before the close of the next business day following such delivery or acceptance notify the Textile Section Research Department, Office of Production Management, in writing, of the amount, the bale numbers, origin, denier, size and color of any bales of Raw Silk so delivered or accepted, the names and addresses of the persons delivering and accepting delivery, and the identifying number or numbers of the War, Navy, or Commerce Department contracts in material delivered under which such Raw Silk is to be physically incorporated.
(f) Appeal. — Any person who considers that compliance with this Order would work an undue hardship upon him may appeal by telegraph or mail to the Director of Priorities, Office of Production Management, Washington, D. C., setting forth the pertinent facts and the reason such person believes that he is entitled to relief.
(g) Efectivo date. — This Order shall take effect immediately.
17. General Preference Order M-22 was again amended October 28,1941, by adding the following paragraph:
(h) Each person having title to raw silk in unbroken bales shall, on or before the close of business on the second day after the effective date of this Amendment, report to the Textile Section, Division of Purchases, Office of Production Management, New Social Security Building, Washington, D. 0., by a written statement showing *64 as to each such bale, the bale number, the weight in pounds, origin, denier, size, color, chop mark, location, the number of the warehouse receipt, if any, whether such receipt is negotiable or not, and the office address and name of the person having custody of each such receipt. Failure to make such a report on the part of any person shall be deemed a representation to the Government, subject to the penalties of Section 35 (a) of the United States Criminal Code, that such person does not have title to any raw silk in unbroken bales.
Upon the promulgation of the foregoing order, OPM forwarded a copy thereof to holders of raw silk with a letter in which such parties were informed of the requirement to file inventory reports. The last paragraph of such letter was the same as the last sentence of the above regulation with respect to penalties under the United States Criminal Code for failure to make such reports.
The reports required by the f oregoing order were filed with the OPM by holders of raw silk, including the plaintiffs in these proceedings.
18. On February 10,1942, the War Production Board, successor to the OPM, amended paragraph (c) of General Preference Order M-22 to read as follows:
(c) Restrictions on sales, deliveries and use.
(1) Sales. — Begardless of any preference rating assigned thereto or of the provisions of paragraph (b) of General Preference Order M-22 as amended October 16, 1941, no person other than Defense Supplies Corporation shall hereafter sell or otherwise transfer title to any raw silk to any person other than Defense Supplies Corporation, and no person other than Defense Supplies Corporation shall hereafter purchase or otherwise acquire title to any raw silk except from Defense Supplies Corporation.
(2) Deliveries prior to February tS, 19J$. — Until February 23, 1942, no person other than Defense Supplies Corporation shall make any deliveries and no person other than Defense Supplies Corporation shall accept delivery of raw silk except (i) to or from Defense Supplies Corporation or (ii) to fill contracts heretofore made under the categories of orders specified in paragraph (b) of General Preference Order M-22 as amended October 16, 1941, unless specifically authorized by the Director of Industry Operations.
*65 (3) Deliveries afer February $$, 191$. — Regardless of any preference rating assigned thereto or of the provisions of paragraph (b) of General Preference Order M-22 as amended October 16, 1941, after February 22, 1942, no person other than Defense Supplies Corporation shall make any deliveries of raw silk to any person except Defense Supplies Corporation and no person other than Defense Supplies Corporation shall accept deliveries of any raw silk except (l) from Defense Supplies Corporation or (ii) as provided in paragraph (b), (2) of General Preference Order M-22, as amended October 16,1941.
(4) Use after March, 1, 1942. — After March 1, 1942, no person shall use any raw silk in fulfilling the contracts specified in paragraphs (b), (1), (i) and (ii) of General Preference Order M-22, as amended October 16, 1941, except raw silk of the types and grades approved for use in such contracts by the Director of Industry Operations.
19. On February 18,1942, the Office of Price Administration revoked Price Schedule No. 14, and did not reissue it under the Emergency Price Control Act of 1942. The order of revocation read as follows:
Price Schedule No. 14, providing maximum prices for raw silk and silk waste, was issued on August 2,1941, for the purpose of remedying inflationary market conditions brought about by speculative forces set in motion as the result of international developments in the Far East. Thereafter, certain provisions of the Schedule were amended, effective September 30,1941.
Since issuance of Price Schedule No. 14, substantially all stocks of silk in the country have been acquired by the United States Government, through agencies thereof, or are presently in the hands of manufacturers fabricating materials in fulfillment of government contracts.
Accordingly, under the authority vested in me by the Emergency Price Control Act of 1942, it is hereby dirGctod *
Price Schedule No. 14 §§ 1338.1 to 1338.9, inclusive, is hereby revoked. (Pub., No. 421, 77th Cong., 2d Sess.)
This order of revocation is effective February 19,1942. Issued this 18th day of February 1942.
20. On or about September 1, 1941, after the issuance of Price Schedule No. 14, referred to in finding 14, Defense Supplies Corporation, a subsidiary of the Reconstruction *66 Finance Corporation, and herein sometimes referred to as “D. S. C.,” sent holders of raw silk a form of purchase contract known as “D. S. C. Silk No. 1,” with a letter of instructions in which Defense Supplies Corporation advised such parties of its willingness to purchase the silk held by them at the price set forth in Price Schedule No. 14 and that it would pay for the silk upon receipt of a satisfactory certificate from the United States Testing Company, Inc., certifying to the quantity and quality of silk covered by the contract. No reference was made in the letter to priorities or priority orders. That form of contract read as follows:
_ (herein (Seller) Address) called “Seller”) for valuable consideration, does hereby grant, sell, transfer and deliver to Defense Supplies Corporation, Washington, D. C. (herein called “Buyer”), and Buyer does hereby purchase from Seller the raw silk described on Schedule A annexed hereto and on the terms and conditions herein set forth:
1. Cash against delivery of satisfactory nonnegotiable warehouse receipts issued in the name of Buyer by a warehouse acceptable to Buyer covering the raw silk purchased. The raw silk shall be delivered to the warehouse at the expense of the Seller.
2. The price per pound shall be the maximum price per pound for raw sük established by the Office of Price Administration Price Schedule No. 14 — PM1279 or any amendments thereto. Such purchase price shall be computed on the basis of Conditional Weight (as established by the United States Testing Co., Inc.) plus 2%. The offering price shall be subject to adjustment on the basis of grades established by official testing certificates of the United States Testing Company, Inc.
8. The following warehouses are designated as acceptable to the Buyer:
United States Testing Company, Inc., Hoboken, New Jersey.
Baker & Williams, New York, New York.
Lackawanna Warehouse Company, Inc., Jersey City, New Jersey.
Independent Warehouse, New York, New York.
Gough & Sernke, New York, New York.
4. The warehouse receipts shall be accompanied by satisfactory testing certificates obtained at the expense of the Seller. Such testing certificates shall certify as to the following:
*67 a. Quality—
Visual skein inspection.
Winding.
Standard seriplane:
1. Evenness.
2. Cleanness.
8. Neatness.
Average size.
b. Qucmtity—
Conditioned weight test:
1. Four bales conditioned weight.
2. Six bales shirt weight.
Conditional weight for lot calculated and reported.
5. The warehouse receipts shal state on their face (or by appropriate instruments executed by the warehouse issuing such receipts) that:
a. All charges (including delivery charges and the warehouse company’s handling in and out charge) against the raw silk covered by such warehouse receipts have been paid to the date of warehouse receipts.
b. The charges of the warehouse for storage of the raw silk shall be not in excess of 200 per bale per month or fraction of a month.
c. The warehouseman will store and deliver such raw silk for which warehouse receipts are issued for the account of the Buyer and will perform the usual services in connection with the care and preservation of the raw silk stored with it at its own expense and will perform such other services at the Buyer’s expense as Buyer may request with respect to the storage and preservation and delivery of the raw silk. Interest will not be allowed with respect to any expenses of the warehouseman for which reimbursement from the Buyer is provided as herein set forth.
d. The warehouseman agrees to make shipments promptly but only upon written request of the Buyer, signed by a representative of the Buyer who has been authorized, to sign, notification of which authorization has been given by the Buyer to the warehouseman.
e. The warehouseman will not permit storage in buildings in which the raw silk is stored of hazardous materials or those which by their nature will tend to cause damage to the raw silk.
f. The warehouseman agrees that the Buyer or its representatives may inspect the raw silk or examine the books and records of the warehouseman at any time.
*68 6. Until payment by the Buyer against delivery of the warehouse receipts the raw silk shall be held at the risk of the Seller.
7. The Seller hereby represents and warrants that it is the lawful owner of the silk described on said Schedule A, that the same is free and clear of all encumbrances and claims, that the Seller has good right to sell the said silk, and will warrant and defend the same against all lawful claims.
In Witness Whereof, the parties hereto have caused this agreement to be executed in quadruplicate.
Seller :
Buyer :
By-
By-
During September 1941, the Defense Supplies Corporation obtained 1,288 bales of raw silk on 23 contracts; during October 2,796 bales on 67 contracts; and during November 3,940 bales on 48 contracts, the form of contract used in each case being D. S. C. Silk No. 1, as set forth above, and the price paid therefor being in accordance with the maximum prices set out in Price Schedule No. 14. On or about December 22, 1941, a new form of contract was adopted by the Defense Supplies Corporation known as “D. S. C. Silk No. 3”, hereinafter more fully described. During December 1941, Defense Supplies Corporation obtained from holders of raw silk a total of 5,717 bales on 68 contracts, D. S. C. Silk No. 1 being used for some of the contracts and D. S. C. Silk No. 3 being used for the others. The prices in all cases were in accordance with the maximum prices set out in Price Schedule No. 14.
21. On or about December 22,1941, Defense Supplies Corporation ceased the use of the form of contract known as D. S. C. Silk No. 1 in its purchases of raw silk and adopted in lieu thereof a form of contract as a basis for obtaining silk known and described as D. S. C. Silk No. 3 which read as follows:
■Whereas, all orders for raw silk placed by Defense Supplies Corporation, Washington, D. C., have been assigned a preference rating of A-10, which makes the acceptance of such orders mandatory, (Amendment to General Preference Order No. M-22, Subsection (iii) of Section 963.1 (b), Title 32 — National Defense, Gnap- *69 ter IX — Office of Production Management, Subchapter B — Priorities Division, Part 963-Silk), and
Whereas, the placing of this order has been requested by the Office of Production Management,
Defense Supplies Coepoeatton, Washington, D. C., hereby places with
(Seller)
(Address)’
a Defense order, pursuant to Priorities Regulation No. 1, and the said General Preference Order M-22, for all raw silk now owned by the Seller, on the terms and conditions herein set forth in Paragraphs 1 and 2 below. It is expressly understood that all silk which the Seller is now using or will need to complete contracts or subcontracts existing between the United States Government and the Seller is hereby excepted from this order. There is annexed and made a part hereof a form marked “Schedule A” for listing the silk which will be supplied under this order.
1. The price per pound shall be the ceiling price per pound for raw silk established by the Office of Price Administration in Price Schedule No. 14-PM 1279 (Schedule No. 14-PM 865 Revised); the aggregate purchase price shall be computed on the basis of Conditioned Weight (as established by the United States Testing Co., Inc. or other approved testing laboratory), plus 2%. The price shall be subject to adjustment on the basis of grades and weight established by official testing certificates of the United States Testing Company, Inc., or other approved testing laboratory.
2. Payment will be made upon the following basis:
(a) Payment in the amount of 85 percent of the aggregate purchase price2 which 85 percent will be calculated at the ceiling price for the invoice weight (or the pro rata amount of invoices weight covered by this contract) of the grade originally purchased by Seller, will be made upon delivery to Defense Supplies Corporation of
(1) the original invoices received .by the Seller when the silk was purchased and
(2) non-negotiable warehouse receipts for the silk issued in the name of the Defense Supplies Corporation provided said documents are in form and substance satisfactory to Defense Supplies Corporation.
(b) The balance of the purchase price will be paid upon receipt of the testing certificates required by Paragraph 1.
*70 3. All accrued warehouse charges of any sort on the silk must be paid by the Seller prior to payment of any part of the purchase price or provided for by a deduction from the purchase price (which deduction is hereby authorized by the Seller) of the amount of such accrued charges at the option of the Defense Supplies Corporation. All other liens against the silk must be similarly paid or provided for. The Seller represents that there are the following liens or claims against the silk and no others:
Amout of
Name and address of creditor Lien Bale Nos.
If the seller is a “foreign national” this contract is not effective until further notice is given the seller by Defense Supplies Corporation.
The cost of transportation and testing incurred in connection with this contract will be borne by the Defense Supplies Corporation.
This order is submitted in sextuplicate; five copies are to be executed by the Seller and returned to Defense Supplies Corporation, 33 Liberty Street, New York City.
Defense Supplies Cokpoeation,
By-
(Authorized agent)
The foregoing order is hereby accepted this-day of_, 194—
(Seller) _
By-
Title_
22. December 23,1941, Defense Supplies Corporation sent a form letter to each known holder of raw silk reading as follows:
For the purpose of acquiring raw silk now owned by you, we enclose Defense Supplies Corporation Silk Contract Form No. 3 with Schedule “A” attached. You will observe that this order covering all raw silk now owned by you has a preference rating of A-10 and acceptance thereof is mandatory. Prompt execution by you and return to us of this contract is required.
We ask that you advise us immediately of any conditions applying to you which are not covered by the contract and instructions enclosed.
You realize, of course, that this action is made necessary because of the importance of raw silk to our National Defense Program, and we will appreciate your cooperation.
*71 That letter was accompanied by a copy or copies of D. S. C. Silk No. 3 to be filled out and executed by the seller.
At the time Defense Supplies Corporation submitted these blank forms of contract to holders of raw silk, whether D. S. C. Silk No. 1 or D. S. C. Silk No. 3, it had incomplete information as to the quantity of silk held by such persons and its denier or grade; and likewise when silk was received under these contracts, Defense Supplies Corporation was not always advised whether the amount so received constituted all the silk then held by a given party. None of these forms ■were filled out when mailed by the Defense Supplies Corporation to the holders of raw silk.
Through the use of D. S. C. Silk No. 3, during Januairy 1942, Defense Supplies Corporation obtained 14,955 bales of raw silk on 146 contracts; during February, 15,623 bales on 84 contracts; during March, 978 bales on 27 contracts; and during the remaining nine months of 1942,1,293 bales on 47 contracts. All of these contracts were carried out at the scale of maximum prices set forth in Price Schedule No. 14.
23. In January 1942, Defense Supplies Corporation began selling raw silk from its accumulated supply. During January it sold 2,788 bales, in February 4,163 bales, in March 8,885 bales, and during the remaining months of 1942 it sold 31,364 bales. During 1943 it sold 3,373 bales, during 1944,4,242 bales, and during 1945,2,172 bales. All such sales of silk were made at the scale of maximum prices established by Price Schedule No. 14, including the sales made subsequent to the revocation of that Price Schedule on February 18,1942.
Throughout the period of the War, Defense Supplies Corporation was able to fill all authorized orders for raw silk. The prices in these transactions were in accordance with Price Schedule No. 14 and the sales were made only for uses as prescribed in the government regulations heretofore set out in these findings. After the Government lifted its restrictions on raw silk, the War Assets Corporation in February 1946 sold at auction 3,308 bales of surplus raw silk at an average price of $11.75 per pound.
24. On February 10,1942, the War Production Board, act-ting pursuant to the Act of October 16, 1941 (55 Stat. 742), requisitioned and took over all raw silk then located in nine *72 warehouses which was not standing in the name of the Defense Supplies Corporation. A total of 17, 177 bales were acquired on this requisition. Of that total, it developed that 3,666 bales were owned by concerns who were working on war contracts and who were utilizing silk in the performance of those contracts and these 3,666 bales were resold to the holders on a wash sale basis. Awards of compensation were made with respect to the remaining 13,511 bales at the base price of $3.08 established by Price Schedule No. 14. On March 17, 1942, the War Production Board, in accordance with the same authority, requisitioned and took over 600 additional bales of raw silk and awards of compensation were made for this silk at the scale of prices set forth in Price Schedule No. 14. One holder of raw silk, A. D. Walker & Company, from whom 100 bales were requisitioned, refused to accept the award and instituted proceedings in this Court (see Walker et al. v. United States, 105 C. Cls. 553).
25. Some months prior to July 1941, Paolino Gerli, who was an important dealer in, and importer of, raw silk and who was very active in the silk industry, recommended to the Government that it stockpile raw silk. July 10, 1941, Defense Supplies Corporation wrote Mr. Gerli a letter purporting to confirm an understanding which had been reached at a conference on July 8 in connection with purchases by Gerli for the account of Defense Supplies Corporation of 50,000 bales of raw silk. Thereafter, various communications passed between Defense Supplies Corporation with respect to suggested revisions of the understanding set out in the letter of July 10. On July 23,1941, Defense Supplies Corporation wrote Mr. Gerli a letter setting forth a contract for the purchase of silk which was to supersede the contract referred to in the letter of July 10,1941, and which it asked Mr. Gerli to sign and return if found acceptable. However, prior to the receipt of that letter, Mr. Gerli on July 23,1941, wrote Defense Supplies Corporation calling attention to fluctuations which were taking place in the silk market and the difficulties in carrying out the suggested arrangement with Defense Supplies Corporation. July 24, 1941, a representative of the Defense Supplies Corporation advised Mr. Gerli by telephone that in view of the circumstances exist *73 ing at that time in the silk market wherein the market prices were substantially higher than the levels which the Defense Supplies Corporation had set out in the proposed contract it would be useless to enter into such an agreement and no such agreement was executed.
26. Government orders applicable to the purchase and sale of raw silk after July 25,1941, did not apply to thrown silk which could be purchased and sold without restriction when such silk was found available for sale. Thrown silk is raw silk the threads of which are combined in a predetermined number to create a certain type of basic thread which is twisted together in the process of throwing. Under normal circumstances a stable relationship existed between the price of raw silk and the price of thrown silk, in which the price of the latter exceeded the price of the former by the cost of throwing plus a legitimate profit. After July 25,1941, however, the price of thrown silk, which had theretofore maintained a normal relationship of an average of about $1.00 per pound over the price of raw silk, increased substantially with the result that during August 1941 thrown silk sold at about $5.50 per pound and for as much as $15.00 per pound in February 1942.
27. On July 26,1941, there were outstanding on the Commodity Exchange a large number of open contracts for the delivery of raw silk in future months. With the termination of trading in silk, it became necessary for the Board of Governors of the Commodity Exchange to determine the price to be used in the settlement of these unliquidated contracts, and the Board of Governors held hearings to determine a basis for settlement at which the interested parties were represented, including both buyers and sellers. After much discussion the Board of Governors decided by a majority vote that the liquidation of these futures contracts should be accomplished on the basis of the closing prices on the Commodity Exchange on July 25,1941.
28. An importer of silk brought suit in the United States District Court for the Southern District of New York, challenging the decision of the Board of Governors of the Commodity Exchange that the liquidation of the futures contracts should be accomplished on the basis of the closing *74 prices on July 25, 1941, as set out in tlie preceding finding. The District Court upheld the decision of the Board of Governors, and its judgment was affirmed by the Circuit Court of Appeals for the Second District. Crowley v. Commodity Exchange, 141 F. (2d) 182. All accounts in the Commodity Exchange were settled in accordance with this decision of the Board of Governors at the prices as of the close of the market on July 25, 1941.
29. At or about the same time on July 26,1941, when OPM issued General Preference Order M-22 placing restrictions on deliveries and processing of silk and when trading in silk on the Commodity Exchange was suspended at the suggestion of OP ACS, referred to in findings 11 and 12, the latter agency sent telegrams to certain manufacturers and dealers in silk advising them that that office was establishing maximum prices on silk based generally on market prices as of July 21, 1941, and inviting them to send representatives to a meeting in Washington, D. C., on July 29, 1941, for the principal purpose of furnishing information with reference to trade practices and differentials among the grades of silk. Prior to that conference OP ACS had already reached a conclusion that the ceiling price to be fixed was the level prevailing on July 21,1941, as shown in finding 14. That conference was attended by a large number of representatives of the silk industry including some of the plaintiffs in this proceeding. While the representatives of OP ACS had already made up their minds prior to the conference what the base ceiling price should be, as shown above, representatives of the silk industry expressed their dissatisfaction with that price and sought to obtain a higher ceiling price giving reasons for an increase. However, the OP ACS adhered to the price previously determined upon. Thereafter, as shown in finding 14, on August 2, 1941, Price Schedule No. 14 was issued with a base price for silk of $3.08 per pound.
Thereafter other protests were made either by individual members of the silk industry or informal groups of members against the ceiling price but OP ACS refused to make any change in the prices set out in Price Schedule No. 14. In addition, as a result of dissatisfaction with the ceiling price, the law firm of Boberts & Mclnnis was employed by some *75 eighteen members of the silk industry to assist in securing an increase in the ceiling price and on November 24, 1941, that firm filed with OPM and the Office of Price Administration, successor to OP ACS, a “Petition for Modification of Existing Orders” in the matter of imposition of priorities and establishment of ceiling prices upon imported raw silk and thrown silk. That petition sought relief which, if granted, would have been applicable to the silk industry generally, the principal relief sought being an increase of the ceiling price from the base price of $3.08 to $3.70 per pound. Of the eighteen members of the industry whom the law firm was authorized to represent, seven of the plaintiffs in this proceeding were included, namely, Cohn-Hall-Marx Co. (No. 47757), Davenport Hosiery Mills, Inc. (No. 47758), Morton Feldman (No. 47760), E. Gerli & Co., Inc. (No. 47761), Kahn & Feldman, Inc. (No. 47763), Fritz de Schulthess et al. (No. 47769), and Sauquoit Silk Company, Inc. (No. 47770).
30. After the filing of the petition referred to in the preceding finding, attorneys from the firm of Roberts & Mc-Innis had conferences with representatives of OPM and OP ACS in which the relief sought in that petition was further urged. December 18, 1941, the Assistant Administrator of the Office of Price Administration wrote Roberts & Mclnnis as follows:
This Office has given full consideration to the matter set forth in the “Petition for Modification of Existing Orders” dated November 22,1941, filed by you on behalf of your clients with this Office and with the Office of Production Management. It has been concluded that, insofar as this Office is concerned, the petition must be denied.
As far as we are aware, no raw silk was imported to this country within a reasonable period prior to the issuance of Price Schedule No. 14, at prices in excess of those established in the Schedule. The great bulk of raw silk remaining in the hands of private holders at the present time undoubtedly was purchased at prices well below the ceiling levels and nothing contained in your petition would indicate that such was not the case with respect to your clients. Finally, this Office remains or the opinion that there is ample basis for the conclusion that the silk price increases during the period from July 21 to July 25, 1941, inclusive, were largely *76 the result of temporary panic buying, based on fear of cessation of silt imports. Such price increases could in no way lead to increased stocks of silk in the United States.
We have noted carefully your contention that your clients have sustained or will sustain loss as a result of the recent curtailment of their silk business. We do not feel that this would justify any general increase of ceiling prices on silk, such as you propose on pages 35 and 54 of your petition. The question of the price at which your clients may be “forced” to sell their silk for defense purposes in view of their alleged “losses” and “destruction of capital,” as stated on page 43 of the petition, is not one which it is within the province of this Office to answer.
On the same day the Director of Priorities, Office of Production Management, wrote Eoberts & Mclnnis as follows:
This office has given careful consideration to your petition for modification of existing orders of the Division of Priorities, Office of Production Management, relating to silk.
It is assumed that you appreciate that so much of your petition as relates to the price of silk is necessarily addressed to the Office of Price Administration and not to the Office of Production Management. The Office of Price Administration has, we understand, replied to your petition on those points.
Insofar as your petition is based on the contention made on page 46 that military uses of silk do not require all of the existing stocks of silk in this country, we can only say that you appear to have been misinformed and that, from the facts in our possession, it is quite clear that the need of the United States for all of the raw silk in this country is immediate and impending. We do not find in your petition any facts advanced which would warrant any alteration in General Preference Order M-22.
31. On or about December 22,1941, as shown in finding 21, Defense Supplies Corporation adopted a new form of contract known as “D. S. C. Silk No. 3” and transmitted copies of that form of contract to holders of raw silk, stating among other things that prompt execution and return of the contract was required. On January 8,1942, Eoberts & Mclnnis on behalf of twelve holders of raw silk, including three of the plaintiffs in this proceeding (Morton Feldman, No. *77 47760; Kahn & Feldman, Inc., No. 47763; and Sauquoit Silk Company, Inc., No. 47770), wrote Defense Supplies Corporation the following letter with respect to amendments or modifications of the new form of contract:
We have to advise that this firm has represented various companies engaged in the silk industry who have endeavored to obtain from the Office of Production Management and the Office of Price Administration a modification of existing orders with respect to the imposition of priorities and the establishment of ceiling prices upon imported raw silk and thrown silk, with which matter you are doubtless familiar.
During the latter part of the month of December 1941 various of our clients received from your corporation a communication enclosing Silk Contract Form No. 3 accompanied with the request that the same be promptly executed and returned. Said letter of transmittal also advised as follows:
“We ask that you advise us immediately of any conditions applying to you which are not covered by contract and instructions enclosed.”
We were, accordingly, requested by various of our clients to consider the terms of the proposed contract insofar as its acceptance in the form tendered might constitute a waiver of any subsequent claims for adjustment of consideration in the event the adjustment heretofore petitioned for would be authorized at a later date and thereafter to submit recommendation for the guidance of the said clients.
Pursuant to such requests and desiring to protect the the interests of our clients we recommended that the contract as tendered be amended to include the following paragraphs:
“The purchaser acknowledges notice of a pending petition for adjustment in ‘ceiling’ prices of raw silk to which the seller is a party and agrees to pay the seller an additional consideration equal to any differential above ceiling prices hereafter determined and allowed by the United States Government, or its agencies, as being just and reasonable for this or similar silk delivered pursuant to its requirements.
“It is further agreed that execution of this contract for delivery of raw silk does not constitute a waiver of any right of the seller to seek hereafter adjustment of the consideration.”
We believe that nothing in the said recommended amendment constitutes a refusal to deliver and we could *78 see no valid objection to the inclusion of said paragraphs in the contract as there seemed no apparent reason why the Defense Supplies Corporation should be unwilling to agree to pay, at a later date, an additional consideration if the Government, itself, finds such payment just and reasonable.
We were subsequently advised that our said recommendation had been referred to your New York Office and that the agent in charge, Mr. G. E. Chapin, had forwarded the same to you for consideration and opinion.
. Under date of January 7,1942, you advised the undersigned via telephone that you had considered the suggested amendment to the contract and had concluded that it would be unadvisable for the Defense Supplies Corporation to consent to any modification or amendment as suggested or otherwise, and that the original form of contract as tendered was the only form acceptable to the Defense Supplies Corporation.
We propose to advise our clients accordingly and to that end would appreciate receiving from you a letter in confirmation of your telephone advice of January 7, above referred to.
. Assuring you of our appreciation for the prompt consideration afforded to us in this matter, we are * * *
January 10, 1942, Defense Supplies Corporation replied to the above letter as follows:
Reference is made to your letter of January 8, 1942, referring to a conversation which the writer had with your Mr. Harold A. Kertz concerning a request by clients of your firm who own raw silk, that they be permitted to insert a special paragraph in DSC Contract Form No. 3 under which this Corporation would, in certain circumstances, agree to pay the seller an additional consideration equal to any differential above ceiling prices hereafter determined and allowed by the United States Government or its Agencies.
As _we advised, your Mr. Kertz by telephone, this Corporation is unwilling to have such a provision inserted in its DSC Contract Form No. 3.
January 14, 1942, Roberts & Mclnnis wrote the following further letter to Defense Supplies Corporation:
The receipt is acknowledged of your letter dated January 10, 1942, wherein you advise that the Defense Supplies Corporation is unwilling to have its DSC Contract *79 Form No. 3 amended as suggested in our letter addressed to you under date of January 8, 1942. Inasmuch, therefore, as your corporation has previously advised our clients that the Defense Orders, placed pursuant to Priorities Regulation No. 1 and General Preference Order M-22 had a preference rating of A-10 and acceptance thereof was mandatory, our clients will execute and return Silk Contract Form No. 3 as required.
We, and, as well, our clients recognize the importance of raw silk to our national defense program, and we deem it our duty to cooperate to the utmost of our ability with that program. We do not feel that our clients have assumed at any time, either prior to or subsequent to July 28,1941, a defiant or evasive attitude, or a position at variance with the emergency requirements of the Government. On the contrary, the members of the industry represented by us have never declined to honor the preference and price orders of the Office of Production Management and the Office of Price Administration, respectively, even though such compliance has been painfully, almost fatally, burdensome to all.
In the Petition for Modification of Existing Orders, a copy of which is herewith enclosed for your information, our clients have contended that their silk, although stored in their possession and at their expense, has been held in trust at the order of the United States Government since July 26, 1941; that from the earliest practicable date and continuously since, by letter, telegram, and orally, they have pledged their property to the use of the Government for defense purposes in compliance with the orders of the Executive Office of the President, but with the clear reservation that they be compensated for the fair value of their property taken for the common defense; and that the fair value of their silk, apart from severances, damages, loss of goodwill, or intangible values and losses incident to the destruction of their business, was not less than a basic price of $3.70 per pound, tested and delivered to the Government or its designees in metropolitan New York.
Our clients relied upon the inherent justice of their claims and contended that justice could only be effected by immediate compensation based on a rate of $3.70 per pound with immediate delivery of possession to the Government, or alternatively, that a contractual stipulation be entered into between them and the Government, or its agent, the Defense Supplies Corporation, for the delivery to that corporation of all of the silk held by *80 them, at the flat “ceiling” price schedule and at the standard specifications and weights under which the silk was purchased, together with provision for submission to arbitration or to an impartial forum for settlement of the balance of their claims and specific provision for the ultimate payment of the award.
Our clients have been cooperative at bitter cost to themselves. They believed that common justice required the adjustment and modification of the hostily (sic) drawn mandates of the closing days of July 1941, and an immediate republication of an equitable price policy.
The relief desired by our clients, however, was denied by the Office of Production Management in a letter addressed to this firm under date of December 18,1941, a copy of which letter is herewith enclosed for your information. The Office of Price Administration also denied the relief sought in a letter addressed to this firm under date of December 18, 1941, a copy of which letter is likewise enclosed for your information. Finally, our clients in an effort to preserve of record their rights endeavored to amend Silk Contract Form No. 3, with which effort and unfavorable result you are familiar.
As indicated in the first paragraph of this letter, our clients will comply with the defense orders placed by your corporation, but said compliance is not to be construed as a waiver of any right on the part of our clients as Sellers to seek hereafter an equitable adjustment of the consideration recited in the Silk Contract Form No. 3, as our clients herewith specifically reserve the right to file an appropriate claim for additional consideration in the event it should be hereafter determined that the claims of our clients are both equitable and reasonable and that the fair market value of the raw silk delivered pursuant to the defense orders of your corporation exceeds the consideration recited in paragraph 1 of the Defense Supplies Corporation Silk Contract Form No. 3.
In order, therefore, that our clients’ interests may be lawfully protected and, as well, in order that their rights may be preserved, we request that this communication be placed of record by submitting the same to your Board of Directors and due notation made thereof upon the Minutes of your corporation, in order that the same will be available upon a final review of the facts in this matter, as and when, submitted to the proper forum for determination.
*81 January 22, 1942, Defense Supplies Corporation replied to the above letter in a communication which concluded as follows:
Your letter of January 14 and the enclosures referred to above have been called to the attention of the Directors of this Corporation and a notation has been made in the minutes of this Corporation indicating that the aforesaid documents were received.
April 10, 1942, Koberts & Mclnnis on behalf of fourteen holders of raw silk, including four of the plaintiffs involved in these proceedings (Cohn-Hall-Mars Co., No. 47757; Davenport Hosiery Mills, Inc., No. 47758; Kahn & Feldman, Inc., No. 47763; and Sauquoit Silk Company, Inc., No. 47770), wrote a letter to the Chairman of the War Production Board, the General Counsel of Defense Supplies Corporation, and the Administrator of the Office of Price Administration in which the effort which had been made by that firm on behalf of silk companies to secure a higher price for raw silk and the cooperative attitude of the silk industry in assisting the war effort were reviewed. The letter referred to the lack of success which had attended these efforts to secure higher prices for silk and concluded as follows:
In the petition above referred to, our clients have contended that their silk, although stored in their possession and at their expense, has been held in trust subject to the order of the Government since July 26,1941; that from the earliest practicable date and continuously since, by letter, telegram and orally, they have pledged their property to the use of the Government in compliance with the orders of the Executive Office of the President, but always with a clear reservation that they be compensated to the extent of the fair value of their property taken in furtherance of the nation’s war program; and that the fair vaiue of their silk, apart from severances, damages, loss of goodwill, or intangible values and losses incident to the destruction of their business was greatly in excess of the ceiling price established by Price Schedule No. 14. From July 25,1941, to date, our clients have been cooperative at great cost to themselves. The only relief desired by our clients was denied, in turn, by the Office of Production Management, the Office of Price Administration, the Defense Supplies Corporation, and, *82 finally, by the Inventory and Eequisitioning Branch of the War Production Board. These denials of relief did not cause noncooperation, but resulted only in a continued and present effort to preserve of record their just right to ask for reasonable compensation at a future date.
In order to avoid even the slightest detraction from the nation’s war effort, our clients will take no further action at this time to obtain the relief to which they are so obviously entitled. However, please be advised that they intend to seek appropriate relief at the end of the war and their failure to contest the matter further at this time does not constitute a waiver of their rights to compensation for the losses which have been inflicted upon them by the orders of the Governmental agencies referred to herein.
32. The OPM required all holders of raw silk to submit to it a report of their inventory of raw silk as of August 2, 1941. For that purpose OPM supplied to such holders form PD-78 which was headed: “Eaw Silk Inventory As of Midnight August 2, 1941”, and thereunder appeared the following :
All persons holding raw silk (exclusive of public warehouses) must properly fill out and return this form in duplicate, together with certification, to the Textile Branch, Office of Production Management, New Social Security Building, Washington, D. C., not later than August 18,1941. This report should cover all branches of the reporting company.
In addition, the silk processors were required to submit a report as of the same date on form PD-77.
By the October 28,1941, amendment to General Preference Order M-22, set out in finding 17, a further inventory report was required to be submitted as of October 30, 1941. OPM furnished to the holders of raw silk form PD-78-A for use in making the report. In the heading of the form appeared the following:
All PeRsons Having Title to Eaw Silk in Unbroken Bales must properly fill out and return this form in duplicate, together with certification, to the Textile Branch, Office of Production Management, New Social Security Building, Washington, D. C., not later *83 than October 30, 1941. This report should cover all branches of the reporting company.
The certification on each form (PD-78 and PD-78-A) read as follows:
CeetipicatioN : The undersigned reporting company hereby represents that the facts above set forth or appended are true and correct, and that it has not violated General Preference Order No. M-22 or any amendment thereto.
- By-
Legal Name of Signature and Title of Date
Reporting Company Authorized Agent
Section 35 (a) of the United States Criminal Code, 18 U. S. C., Section 80, makes it a criminal offense to make a false statement or representation to any department or agency of the United States as to any matter within its jurisdiction.
33. As shown in finding 32, all holders of raw silk were required to submit a report of their inventories of raw silk as of August 2,1941, on form PD-78, and also as of October 30, 1941, on form PD-78-A. The Court held in the Stahel cases that there was a “taking” on October 16, 1941, of raw silk owned on that day by those plaintiffs. Irrespective of the decision in the Stahel cases, the plaintiffs in these proceedings are contending that the “taking” occurred on July 26,1941, rather than on October 16,1941.
On January 18, 1954, the parties filed two stipulations of facts: one with respect to deliveries of raw silk by the plaintiffs to Defense Supplies Corporation and to private concerns between July 26 and October 16, 1941; and the other with respect to deliveries of raw silk by the plaintiffs to Defense Supplies Corporation and to private concerns subsequent to October 16, 1941. These stipulations also show when payments were received for these deliveries, the extent to which the silk so delivered was reported on PD-78 and/or PD-78-A, whether deliveries to private concerns were on priority contracts, and other information with respect to such deliveries. These stipulations are incorporated herein by reference and made a part of these findings. The findings which follow are in a large part based upon these stipulations.
*84 34. During tbe period between July 26 and October 16, 1941, tbe plaintiffs made deliveries of raw silk under contracts with tbe Defense Supplies Corporation and with private owners for which they received a total of $1,113,099.53. Some of tbe deliveries to private concerns were on priority contracts but as to the balance of deliveries to private concerns, the parties were unable to reach an agreement that such deliveries were on priority contracts.
After October 16, 1941, the plaintiffs made deliveries of raw silk under contracts with the Defense Supplies Corporation and with private concerns for which they received a total amount of $6,982,543.47. All of the silk deliveries to private concerns after October 16, 1941, were on priority contracts.
The base price for all deliveries was $3.08 per pound for grade D (78 percent), 13/15 denier, Japanese white silk in accordance with Price Schedule No. 14. The quantities delivered by the respective plaintiffs were as follows:

*85 35. Of the raw silk delivered during the period July 26 to October 16,1941, 2,148 bales were reported on form PD-78, the inventory form required to be filed as of August 2,1941. A reasonable conclusion from the evidence is that the quantities so reported as of August 2,1941, and delivered during the period July 26 to October 16, 1941, represented quantities owned by the respective plaintiffs on July 26,1941, and held by them from that date until delivered during the period July 26 to October 16,1941.
Of the raw silk delivered subsequent to October 16,1941, various quantities were reported by the respective plaintiffs on either form PD-78 or form PD-78-A which was required to be filed as of October 30,1941, or on both forms. A reasonable conclusion from the evidence is that silk delivered after October 16, 1941, and previously reported on form PD-78, or PD-78-A, or on both forms, may be considered as silk owned by each of the plaintiffs on October 16,1941, and held by each of them from that date until its subsequent delivery to the Defense Supplies Corporation or to private concerns on priority contracts. The parties have stipulated that the expenses incurred by the plaintiffs for storage, insurance, handling and tagging amounted to 35y2 cents per bale per month. Interest at 4 percent per annum from the date of taking to the dates of payment was allowed in the Stahel cases as compensation for delay in payment. On the basis of the foregoing with respect to deliveries subsequent to October 16,1941, the following tabulation shows the quantity (bales) of silk on hand on October 16,1941, the amount allowable as carrying charges from October 16, 1941, to the dates of delivery, and the amount allowable as compensation for delay based on the price of the silk and the rate of interest determined in the Stahel cases:[1]

*86

Claim, for Regrading

36. The contract forms forwarded by the Defense Supplies Corporation to the plaintiffs in these proceedings and executed by them provided that the price per pound should be maximum price per pound for raw silk established by Price Schedule No. 14 and that such price was subject to adjustment on the basis of grades and weights established by official testing certificates of the United States Testing Company, Inc., or other approved testing laboratory. The provision with respect to weights and tests was substantially the same requirement as contained in the rules of the Commodity Exchange for all silk for delivery on sales through the Exchange.
*87 A substantial portion of the raw silk owned by the plaintiffs herein on July 26, 1941, and later delivered to Defense Supplies Corporation or to private concerns on priority orders was purchased as specific grades from importers and dealers for immediate delivery in the uptown market. The silk so purchased usually carried the grade classifications established by testing laboratories in Japan. The Japanese tests were generally one grade higher in quality than the grades determined by the United States Testing Company, Inc., for the delivery of silk on sales on the Commodity Exchange and provided in the contracts with Defense Supplies Corporation.
At a pre-trial conference it was agreed between the parties that an increase of l/10th of a cent a pound on account of downgrading was allowable on Government deliveries after July 26,1941. The following tabulation shows the sums that would result by the application of an increase of l/10th of a cent a pound on account of downgrading for deliveries to Defense Supplies Corporation and to private concerns on priority orders on deliveries after October 16,1941:

*88 COiN'CLTTSION' OS’ LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs in Nos. 47764 and 47765 are not entitled to recover, and their petitions are therefore dismissed.
The court further concludes that the remaining plaintiffs are entitled to recover the amounts set forth below:
No. 47755 Alpha Silk Company_ $840.12
47756 Bear Brand Hosiery Co- 4,367.25
47757 Cohn-Hall-Marx Co_ 1,968.85
47758 Davenport Hosiery Mills, Inc_ 1,318.68
47759 George Blbogen & Co- 693.04
47760 Morton Feldman_ 541.98
47761 B. Gerli & Co., Inc_13,152. 71
47762 Holeproof Hosiery Co_ 2,438.64
47763 Kahn & Feldman, Inc- 29,086. 61
47766 Dorgin Textile Corporation_ 607.55
47767 Phoenix Hosiery Company_ 5,907.91
47768 Budolph-Deseo Company, Inc_ 1,542.00
47769 Fritz de Schulthess and Monica de Schulthess, co-partners doing business as de Schulthess & Company, formerly known as Charles Budolph & Co- 1,425.26
47770 Sauquoit Silk Company, Inc- 3,382.96
47771 Siber Hegner & Company, Inc_ 128.42
47772 Standard Hosiery Mills, Inc- 590.60
47782 Belding Heminway Company_ 3,016. 59
47783 Gudebrod Bros. Silk Co., Inc- 547.07
47784 Miller-Smith Hosiery Company_ 1, 361. 50
47785 Lawrence Schiff and Sidney L. Schiff, partners doing business as Lawrence Schiff Silk Mills- 398.85
47786 John Hand & Sons, Inc_ 355.08

 This affirmation must be signed by the buyer or by the seller, or by a partner or officer of the buyer or seller.

 In the event that any sales, purchases, or deliveries of raw silk or silk waste have been made at prices in excess of those established by the Schedule, the above text should be suitably changed and a list should be appended hereto giving with respect to each such sale, purchase, or delivery, the date thereof, the name of the seller or purchaser, as the case may be, the quantity, type, and grade of raw silk or silk waste sold, purchased, or delivered, and the reasons for exceeding the maximum price.

 The computation is prepared only with respect to deliveries subsequent to October 16, 1941, since the factors necessary for such a computation are supplied herein and in the Stahel cases.